IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

MARY CHAMPION, *et al.*,             )
                                     )
      PLAINTIFFS,                  )
                                     )
v.                                   )   CASE NO.: 3:03-cv-275-MEF
                                     )
RICHARD HOMA, *et al.,*              ) (WO-Not Recommended for Publication)
                                     )
      DEFENDANTS.                  )

## MEMORANDUM OPINION AND ORDER

Two limited liability corporations,[1] individuals who formed  them and made certain investments, and investors in the offerings of limited liability corporations bring suit for various violations of state and federal securities laws, RICO violations, and other claims against two men they contend scammed them and the law firm and a partner in the law firm involved in preparing the documents associated with the investments and conducting "due diligence."  This cause is before the Court on the Motion to Dismiss by Defendants Dill, Dill, Carr, Stonbraker & Hutchings, P.C. and Fay Matsukage (Doc. # 10) filed on June 9, 2003. Pursuant to Rules 12(b)(1), (b)(2), and (b)(6) of the Federal Rules of Civil Procedure two of the defendants to this action, the law firm of Dill, Dill, Carr, Stonbraker & Huchings, P.C. ("the Dill firm") and Fay Matsukage ("Matsukage") an attorney with the Dill firm, seek dismissal of all nineteen claims asserted against them.  For the reasons set forth in this

---

[1]  They are Southwestern Holdings, LLC ("Southwestern") and Bellwether, LLC ("Bellwether").

Memorandum Opinion and Order, the motion is due to be GRANTED.

## SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because some of Plaintiffs' claims arise under federal statutes such as the Federal Racketeering Influence and Corruption Organization Act ("RICO"), 18 U.S.C. § 1964 *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On March 12, 2003, Plaintiffs filed this lawsuit alleging various violations of state and federal law by the named defendants. On May 7, 2003, prior to the filing of any responsive pleading, Plaintiffs filed Plaintiffs' Amended and Superceding Complaint (Doc. # 7), which sets for the claims now before this Court.

### A. Plaintiffs

This suit is brought on behalf of a large number of individuals or entities from a variety of states. The plaintiffs can be categorized in a variety of ways such as the place of their residence or their role in the alleged Ponzi scheme. The vast majority of the plaintiffs to this action are alleged to have merely been investors in the alleged scheme. For the sake of clarity, the Court will first identify the Investor Plaintiffs.

Several Investor Plaintiffs are alleged to be residents of Alabama.[2]  Several Investor Plaintiffs are alleged to be residents of California.[3]  Many of the Investor Plaintiffs are alleged to be residents of Colorado.[4]  Some of the Investor Plaintiffs are alleged to be residents of Florida.[5]  Some of the Investor Plaintiffs are alleged to be residents of Georgia.[6]

---

[2]  Of those plaintiffs alleged to be Alabama residents several are alleged to have been investors in Bellwether:  Mary A. Champion; Lonnie L. O'Rear, Sr.; Lonnie O'Rear, Jr.; Kenneth D. Griffin, Jr.; Richard L. Elwood; and Allen Austin.  The remaining Alabama resident plaintiffs are alleged to have been investors in Southwestern:  J.D. Gooden, Sr.; Thomas M. Hayley; Richard L. Elwood; Pipe & Equipment Company; Allen Franklin; Bette G. Adair; Betty Jo Barnett; K. Donald Griffin; Howard Ayers; Donnetta L. Gallups; Lee C. Harper; Elvis Larkin, Jr.; William Parks Jacobs; James C. Lee, III; June Tommie, as Executrix of the Estate of O. Manly Tommie, Jr.; Steven Isbell; John M. James; W. Sanders Pitman; Richard M. Franke; and Steve Young.  Kenneth D. Griffin, Jr., Pipe and Equipment, Allen Franklin, Bette Adair, Donald Griffin, and June Tommie only assert claims under the First, Second, Sixteenth, Seventeenth, and Nineteenth Claims for Relief.

[3]  Of those plaintiffs alleged to be California residents several are alleged to have been investors in Bellwether: Vivian Harris; George Henry Myers; Larry Hofer; Carolyn Davidson; Kathleen Cunningham; Cathy Guffey; Trust U/W of James M. Elwood, III; Robert and Christina Fehrman; Charles L. Guffey; Leslie W. Binder; Jack W. Eastman.  The California resident alleged to have been investors in Southwestern is Donna Snover.

[4]  Of the Colorado plaintiffs, the following plaintiffs are identified as Bellwether investors: Donnalie Gass; Bonnie Britton; James Bacon, Carol A. Preisser Family Trust; Robert Van Diest; Michael P. Klis; Noel C. Dalbey; Daniel M. Roe; Bernard and Bonnie Britton; Connie J. Brasher; James and Carolyn Kavinsky; Stanton A. and Anne Marie Gallager; Linda M. Voss; J. Will Housworth; Ralph E. Hill; Joanne M. Hill; Alfred and Jean Curtis; Dan S. Hammack; Misha Roell; J. Karstan Roell; Eberhard Roell; and Marjean James.  Of the Colorado plaintiffs, the following plaintiffs are identified as Southwestern investors: Parmer A. Gillespie, III; Irene A. Wilt Family Trust; Robert D. Nassimbene; Jean Neuman; James R. Neuman; Nassimbene Family Investments, LLC; Robert R. Munoz, Jr.; Alfred & Jean Curtis; and Syndi O'Brien.

[5]  Of the Florida plaintiffs, the following plaintiffs are identified as Bellwether investors: Harry Carlon; Eugenia Carney; Susan Castrianni; A. John and carol A. Clark; James K. Clary; Stuart and Wanda Culpepper; Georgia M. Bushwar and Wanda Culpepper;

Four of the Investor Plaintiffs are alleged to be residents of Iowa.[7]   One of the Investor

Plaintiffs is alleged to be a resident of Kansas.[8]   One of the Investor Plaintiffs is alleged to

be a resident of Kentucky.[9]   Two of the Investor Plaintiffs are alleged to be residents of

Michigan.[10]   One of the Investor Plaintiffs is alleged to be a resident of Nebraska.[11]   Some

of the Investor Plaintiffs are alleged to be residents of Nevada.[12]   One of the Investor

---

George and Sarah Freeman; Fred and Joyce Guentert; Helen and Gene Showers; and James R. Swinney, III.  Of the Florida plaintiffs, the following plaintiffs are identified as Southwestern investors: Stuart and Wanda Culpepper; Bill C. Dearman; Nancy A. Gibson; Georgina Lindenberg; and Donald C. and Patricia Rand.

[6]   Of the Georgia plaintiffs, the following plaintiffs are identified as Bellwether investors: Marion L. Lengen; Martha Elaine Wilson; Bobby R. Childree; Sally Macaulay; Richard Harrison; Nancy W. Carroll; Benjamin Daniel; Warren W. Foley; Robert A. Herb, Jr.; E.A. Gilbreath; Robert H and Nancy T. Ledford; Dorothy Macaulay; Roger Roesler; Jim L. Smith; Virginia Helms; David Zorger; Virginia G. And Joe W. Andrews; Trebor S. Brown; John A. Owen; Belle M. Clemetson; William G. Cowell; and Frank W. Love.  Of the Georgia plaintiffs, the following plaintiffs are identified as Southwestern investors: Betty R. Williams; H. Doc Ayers; Ronald G. Isbell; Robert M. Wimberly; Neil Rowland Boggs; Dorothy Macaulay; Guy Kelley; Allan Murrah; Carolyn E. Renn; Minta S. Chadwick; Felix A. and Irene Sharpton; Faye O. Porter; John C. Porter; Mark G. Summers; Harry and Beverly Lynch; Russell Daniel, III; William Godwin; John Tate; and J. Ronald Stowe.

[7]   All of the Iowa plaintiffs (Junior and Elnora Hurlburt; Woods Family Living Trust; and Jeffrey D. Johnson) are identified as Southwestern investors.

[8]   Shirley A. Ochsner of Kansas is identified as a Bellwether investor.

[9]   Jitendra Mehita of Kentucky is identified as a Bellwether investor.

[10]   Mark W. Putnam and Charles C. Putnam, both of Michigan are identified as Bellwether investors.

[11]   Roberta J. Loescher of Nebraska is identified as a Bellwether investor.

[12]   Of the Nevada plaintiffs, the following plaintiffs are identified as Bellwether investors: James L. Guffey; Joanne Guffey; Willard and Anna Schneider; John and Shirley

4

Plaintiffs is alleged to be a resident of Ohio.[13]  Two of the Investor Plaintiffs are alleged to

be residents of Pennsylvania.[14]  Many of the Investor Plaintiffs are alleged to be residents of

South Carolina.[15]  Some of the Investor Plaintiffs are alleged to be residents of Tennessee.[16]

Some of the Investor Plaintiffs are alleged to be residents of Virginia.[17]  Some of the Investor

Plaintiffs are alleged to be residents of Washington.[18]

      The next category of plaintiffs to this action are the Marketer/Investor Plaintiffs.  Like

the Investor Plaintiffs, the Marketer/Investor Plaintiffs are from a variety of states within the

---

Fehrman; and Judith Sitzer.

[13]  James G. Crenshaw, Jr. Of Ohio is identified as a Bellwether investor.

[14]  The two Pennsylvania plaintiffs, Faye Henigin and Ann E. Paden, are identified as Southwestern investors.

[15]  Of the South Carolina plaintiffs, the following plaintiffs are identified as Bellwether investors: Regina Haddad Trust; Evangeline K. Holseberg; Lucia O. Ivanovich; Jimmie and Bessie Mantakas; BSST Trust for Thomas J. Dobson; BSST Trust for Andrew P. Dobson; Dobson Tape Ministry; Harry G. Wood; Mary Latchaw; Dr. Tom A. Siachos; Willard V. Ammons; Rita C. Reeves; John M. Barnard; Constantine and Stan Tzouvelekas; and Theodore "Ted" Siachos.  Of the South Carolina plaintiffs, the following plaintiffs are identified as Southwestern investors: Robert A. Dobson, III; Dobson Tape Ministry; Dobson Management Corporation; Greg M. Johnson; Maxie R. Layton; Fred J. McElveen; Emilie D. Theodore; Jackie Hooks Wests; Russell A. Wagner; Ibrahim M. Elaraby; Clyde Matkin; Doug Wilson; Howard Covington; and John Robinette.

[16]  Of the Tennessee plaintiffs, the following plaintiffs are identified as Bellwether investors: A. John and Carol A. Clark.  Of the Tennessee plaintiffs, the following plaintiffs are identified as Southwestern investors: Tom A. and Vera T. Harness; and Shirley L. Cox.

[17]  The following Virginia plaintiffs are identified as Bellwether investors: Christopher Korba and Mary Walker Korba; and Doug and Cindy Cox Wise.

[18]  The following Washington plaintiffs are identified as Bellwether investors:  Eldon Hunt; Eldon Hunt Conservator; and Robert Pound.

United States.  The Marketer/Investor Plaintiffs are: James C. Norton; Norton Financial, Inc.; Joe Pertz; Sunshine Cottages, Inc.; Steve Nichols; Safeharbor Advisors, Inc.; Hugh Macaulay; Macaulay Marketing, LLC; Andrew Leventis; Priority Advisors, Inc.; Charlie M. Thackston; Management and Benefit Services, Inc.; Lawrence B. Lavin; Spencer Capital Growth, Inc.; Philip Sharpton; Ken Campbell.  The Marketer/Investor Plaintiffs allege that they were harmed in two ways: 1) they lost money as investors in Bellwether or Southwestern and 2) they have been sued by investors they advised to buy Bellwether or Southwestern.

The final category of plaintiffs to this action are two corporations.  Plaintiff Bellwether is a Nevada limited liability corporation which alleges that it was damaged by Defendants as set forth in the First, Second, Seventeenth and Nineteenth Claims for Relief.  Plaintiff Southwestern is also a Nevada limited liability corporation which alleged that it was damaged by Defendants as set forth in the First, Second, Seventeenth and Nineteenth Claims for Relief.

## B.  Defendants

Plaintiffs bring this suit against four defendants: Richard Homa ("Homa"), Michael Gause ("Gause"), the Dill firm, and Matsukage.

### 1.  Homa and Gause

According to Court records, both Homa and Gause have been served, but neither has answered or otherwise responded to the Complaint or the Amended and Superceding Complaint.  Homa and Gause are alleged to be Georgia residents.  Recently, Plaintiffs

dismissed their claims against Gause, who is believed to have died during the pendency of this lawsuit.  Plaintiffs are in the process of seeking a default judgment against Homa.

### 2.  The Dill firm and Matsukage

The Dill firm is alleged to be a Colorado corporation which provided legal securities advice to Bellwether and Southwestern; investigated, drafted or approved the offering statements for Bellwether and Southwestern; drafted and approved the bonds or promissory notes for Bellwether and Southwestern; and researched and assured Marketer/Investor Plaintiffs and Corporation Plaintiffs that the offering statements, promissory notes and bonds offered by Bellwether and Southwestern complied with federal and state securities laws. Matsukage, a Colorado resident, is alleged to be a partner in the Dill firm and the attorney responsible for the actions of the Dill firm giving rise to this lawsuit.

## C.  The Allegations Regarding the Factual Predicate for the Action[19]

### 1.  The Set Up

In or about May of 1997, one or more of the Marketer/Investor Plaintiffs became aware of efforts by Gause and M.E.G.A. Trust to raise funds to provide loans to a company or companies — C4T — owned by Homa.  C4T was engaged in the business of making car title loans to the general public through stores known as Cash 4 Titles.  Gause and Homa told one or more of the Marketer/Investor Plaintiffs that large interest returns were being made

---

[19]  Due to the procedural posture of this case, the Court bases this summary of the factual predicate for the lawsuit on the allegations of the Plaintiffs' Amended and Superceding Complaint (Doc. # 7).

by investors on the loans to M.E.G.A. Trust, which, in turn, loaned money to Homa for use in Cash 4 Titles stores.  Gause represented investors would receive between 1% and 4% per month on funds loaned to M.E.G.A. Trust.

In the summer of 1997, one or more of the Marketer/Investor Plaintiffs met in Georgia with Gause to discuss possible investments in M.E.G.A. Trust.   Gause was the principal behind the fund-raising entity M.E.G.A. Trust which loaned money to Homa for use in Cash 4 Titles stores.  Gause informed one or more of the Marketer/Investor Plaintiffs that 270 Day Promissory Notes were being offered to investors by M.E.G.A. Trust.  He represented that the funds raised through M.E.G.A. Trust were loans to C4T for use in making car title loans. He represented that the loans from M.E.G.A. Trust would be secured with the car titles from the Cash 4 Title stores's customers.  Gause represented that Cash 4 Title stores never loaned more than 30% of the wholesale value of the car and that consequently, Cash 4 Titles always had more than sufficient collateral to secure the loans to customers and this insured repayment of principal and interest.  Gause represented that Cash 4 Titles' stores loaned money on a short term, usually thirty days, and charged 25% interest per month on the money loaned.

Because of the representations of Gause and Homa, one or more of the Marketer/Investors Plaintiffs began investing in promissory notes issued by M.E.G.A. Trust. Additionally, they facilitated the investment by certain of the Investor Plaintiffs on these notes.  The funds from these investments were to be sent to Gause and M.E.G.A. Trust for

distribution to C4T for use in loans to customers.  In reality, the investment was a Ponzi scheme.

### 2.  Bellwether

In later 1997 and early 1998, the Marketer/Investor Plaintiffs Steve Nichols, Phil Sharpton, Jim Norton and Joe Pertz formed Bellwether to market 270 day promissory notes similar to those offered by M.E.G.A. Trust.   Bellwether was allegedly formed to provide better security and accounting procedures to Investor Plaintiffs for the funds which were loaned to Gause and eventually to Homa, C4T and the Cash 4 Title stores.  Bellwether came into existence in February of 1998.  Bellwether's offering documents and promissory notes were patterned after the offering documents and promissory notes used by M.E.G.A. Trust and indicated Bellwether was created to consolidate monies for the car title loan industry and the funds raised through the sale of notes would be invested in the car title lending industry and investor returns would be generated by car title loans.

Bellwether and the Marketer/Investors Plaintiffs retained Matsukage and her firm, the Dill firm, to investigate the legality of forming a company to facilitate these investments; to review and investigate the Bellwether offering documents and notes to ensure the offering documents were truthful and accurate and complied with federal and state securities law; and to ensure that the Bellwether offering statement and promissory notes did not contain any misrepresentations or omissions.

The Dill firm did not disclose to the Marketer/Investor Plaintiffs or to Bellwether that

Matsukage had been involved in offering a security which was a pyramid scheme similar to this case. These facts are material facts which, if known, by the Investor/Marketer Plaintiffs, the Investor Plaintiffs, and Bellwether would have caused them not to have relied upon the Dill firm's or Matsukage's advice regarding the purchase or sale of the promissory notes offered by Bellwether.

According to Plaintiffs' allegations, by virtue of their role as attorneys for the issuer, the Dill firm and Matsukage were under a duty to do a number of things as part of their due diligence: engage in a preliminary review of Bellwether's quality and integrity; form, direct and oversee a competent working group for the disclosure process; establish a due diligence environment for the issuer and working group in which every participant has been sensitized to the disclosure requirements of the securities laws and the attendant risk of liability to investors; conduct meetings with the officers of the issuer and other persons involved to gain a basic understanding of the terms of the offering and its purpose, the nature of the issuer's business, other business risks, and the regulatory schemes applicable to the enterprise; prepare a due diligence checklist; prepare and distribute a directors, officers, and principal shareholders' questionnaire inquiring into each person's background and experience.; prepare a presentation format and an initial working draft of the disclosure documents after reviewing all relevant information; conduct and control an extensive "due diligence investigation; compare all information across sources to verify it; and write, edit, review, and revise disclosure documents in consultation with the entire working group using independent

professional judgment about the adequacy of the disclosure documents.  The Dill firm assured Bellwether and the Marketer/Investor Plaintiffs that the Bellwether offering documents and promissory notes contained no misrepresentation or omission and complied with all federal and state securities regulations.  The Dill firm advised Bellwether and the Marketer/Investor Plaintiffs that it was appropriate and legal for the Marketer/Investor Plaintiffs to use third parties to market the promissory notes in Bellwether.  The Dill firm advised the Marketer/Investor Plaintiffs that the promissory notes offered by Bellwether did not have to be registered under federal securities laws and the various state laws in which these securities would be offered.  The Bellwether offering statement, which the Dill firm investigated, reviewed, and approved contained a number of intentional, reckless, negligent or innocence misrepresentations.[20]

Money from investors in Bellwether was wired to Citibank in New York City to an account for Sunset Financial.  Eventually, those funds were wired for further credit to the Bank of Bermuda in the Cayman Islands, where Homa and Gause maintained accounts. Matsukage and the Dill firm oversaw and controlled the wiring of funds from Bellwether to Citibank.  The Dill firm and Matsukage reviewed most, if not all, Bellwether investments to determine alleged compliance prior to allowing funds to be wired to Citibank.

Matsukage and the Dill firm knowingly allowed the offering documents and

---

[20] These misrepresentations are specified in paragraph 228 of the Plaintiffs' Amended and Superceding Complaint (Doc. # 7).

promissory notes, which they had drafted or approved and which they knew to be inaccurate and to contain fraudulent statements, to be mailed via the United States mail to further Homa's and Gause's Ponzi scheme.  The Dill firm and Matsukage met with Homa and used interstate telephone communication to communicate with Homa regarding the fraudulent scheme and to substantiate their role in the scheme.

From February of 1998 to June of 1999,[21] Bellwether and the Marketer/Investor Plaintiffs raised funds through the sale of 270-day promissory notes to the Bellwether Investor Plaintiffs based on the assurances of the Dill firm and Matsukage.  The Bellwether Investor Plaintiffs purchased promissory notes from Bellwether and the Bellwether Marketer/Investor Plaintiffs in reliance on the offering statements and promissory notes reviewed and approved by Defendants Matsukage and the Dill firm.  These documents were provided to the Bellwether Investor Plaintiffs using the United States mail.

### 3. Southwestern

In or about August of 1998, Marketer/Investor Plaintiffs Frank Miller, Hugh McCauley, Andrew Leventis, Charlie Thackston, Lawrence B. Lavin, Steve Nichols, Phil Sharpton, Jim Norton, and Joe Pertz formed a second entity, Southwestern.  The purpose of the entity was to market seven year bonds to investors.  The proceeds from the sale of the bonds would be loaned to Sunset Financial for the purpose of making car title loans.

---

[21] Sales continued until June 1999, when Marketer/Investor Plaintiff Steve Nichols ceased the Bellwether offering in response to his receipt of a subpoena from the Government in the related SEC litigation.

Southwestern was formed so the funds raised by Southwestern would never leave the United States and so Southwestern would have a security interest in the accounts receivable of Sunset Financial, the company to which Southwestern would be loaning investor proceeds and who in turn would provide the proceeds to C4T and Cash 4 Title.

Prior to selling any bonds, Southwestern and the Marketer/Investors retained Matsukage and the Dill firm to investigate, compile, and draft the Southwestern offering documents.   In addition to drafting the offering documents, Southwestern and the Marketer/Investor Plaintiffs retained the Dill firm and Matsukage to investigate the proposed transaction with Sunset Financial, to ensure that the offering statements and securities offered by Southwestern were in compliance with all federal and state securities laws, and to ensure that Southwestern made no misrepresentations in the offering documents.

According to Plaintiffs' allegations, by virtue of their role as attorneys for the issuer, the Dill firm and Matsukage were under a duty to do a number of things as part of their due diligence: engage in a preliminary review of Southwestern's quality and integrity; form, direct and oversee a competent working group for the disclosure process; establish a due diligence environment for the issuer and working group in which every participant has been sensitized to the disclosure requirements of the securities laws and the attendant risk of liability to investors; conduct meetings with the officers of the issuer and other persons involved to gain a basic understanding of the terms of the offering and its purpose, the nature of the issuer's business, other business risks, and the regulatory schemes applicable to the

13

enterprise; prepare a due diligence checklist; prepare and distribute a directors, officers, and principal shareholders' questionnaire inquiring into each person's background and experience.; prepare a presentation format and an initial working draft of the disclosure documents after reviewing all relevant information; conduct and control an extensive "due diligence investigation; compare all information across sources to verify it; and write, edit, review, and revise disclosure documents in consultation with the entire working group using independent professional judgment about the adequacy of the disclosure documents.

The Southwestern offering statement, which the Dill firm investigated, reviewed, and approved, contained a number of intentional, reckless, negligent or innocence misrepresentations.[22]  The Dill firm and Matsukage also investigated, drafted, and approved the Southwestern bond provided to Investor Plaintiffs which contained material misrepresentations.

The Dill firm and Matsukage engaged Troutman & Sanders as part of the Southwestern offering to perform due diligence upon and investigate the accounts receivables for Sunset Financial to ensure such existed and file a UCC-1 form showing Sunset Financial had pledged all of its accounts receivables to Southwestern as collateral for a promissory note to Southwestern in the amount of $10 million.  In November of 1998, Southwestern received a security agreement and UCC-1 form allegedly showing Sunset

---

[22] These misrepresentations are specified in paragraph 238 of the Plaintiffs' Amended and Superceding Complaint (Doc. # 7).

Financial had pledged all of its accounts receivable to Southwestern as collateral for a promissory note in the amount of $10 million.  The Plaintiff Investors proceeds from Southwestern were sent to a U.S. bank account in Denver and then to Sunset Financial's U.S. bank account in Florida.  The Dill firm and Matsukage oversaw this wiring process.  Sunset Financial was then to direct investor proceeds through a bank in New York for further credit to bank accounts of C4T in the United States.  Instead, the funds were being directed to the Bank of Bermuda and eventually to Gause and Homa for improper purposes.  Southwestern Investor Plaintiffs purchased bonds from Southwestern in reliance on the offering documents and bonds prepared by the Dill firm and Matsukage and the security interest allegedly perfected.

Matsukage and the Dill firm met with Homa to discuss the formation of Southwestern. They also used interstate telephone lines to communicate regarding the formation of Southwestern and the Dill firm's role in the Ponzi scheme.  Matsukage and the Dill firm also used interstate channels of U.S. mail by allowing the fraudulent offering documents and bonds which they had drafted to be forwarded to the Investor Plaintiffs.  Matsukage and the Dill firm also used interstate commerce to provide to the Securities Commissions of each state in which the bonds would be offered for sale fraudulent exemption documents which falsely represented that the bonds were exempt from any federal or state registration requirements.  These documents allowed the bonds to be sold in the states in which the documents had been filed.   Matsukage and the Dill firm knew they could not properly

register the bonds in any of the states because the investment was a Ponzi scheme and Matsukage and the Dill firm did not have the required documentation in order to properly register the securities in the various states in which they would be sold.  Matsukage and the Dill firm also used interstate mail to review and approve all the subscription agreements for any Investor Plaintiff in Southwestern.  Matsukage and the Dill firm also oversaw and controlled the wiring of the Investor Plaintiffs' funds to Sunset Financial's accounts.

### 4.  The Ponzi Scheme

Unbeknown to the Investor Plaintiffs and the Marketer/Investor Plaintiffs, most of the investor funds raised through Bellwether and Southwestern were not used in the car title loan business or transferred to C4T.  Instead, the majority of the funds were allegedly transferred to accounts at the Bank of Bermuda in the Cayman Islands controlled by Gause and Homa and used, in classic Ponzi scheme fashion, to pay interest on the notes and bonds of earlier investors and to pay the personal expenses of Homa and Gause.  Without the air of legitimacy provided by the offering documents, promissory notes, and state filings drafted by the Dill firm and Matsukage, Gause and Homa could not have engineered and perpetrated the Ponzi scheme.

### 5.  RICO Allegations

Plaintiffs allege that Defendants conducted and participated in the Ponzi scheme through a pattern of racketeering activity within the meaning of the RICO statute.  In the course of conducting and participating in Cash 4 Title affairs, Defendants allegedly devised

or executed schemes to misappropriate and divert funds loans for Cash 4 Title's business which schemes constituted mail fraud and wire fraud.  Plaintiffs further allege that as part of Defendants' operation of the enterprise, they engaged in and otherwise caused countless financial transactions and transfers through financial institutions which constituted money laundering.  Once government authorities began investigating Defendants' criminal conduct, Defendants concealed their activity by means which violated the federal criminal code. Defendants allegedly conducted this racketeering activity through a pattern of related and continuous acts that began in mid-1997 and continued until at least April of 2001.  The predicate acts all had the purpose of diverting and misappropriating monies loaned for Cash 4 Title's business.  Defendants used the mails and wires in furtherance of their scheme. Homa and Gause and through them other Defendants (presumably Matsukage and the Dill firm)  caused losses to the Plaintiffs.  In addition, the Marketer/Investor Plaintiffs were caused to incur legal fees, fines, penalties and other damages as a result of the SEC's investigations into the Cash 4 Title scheme.  The Marketer/Investor Plaintiffs suffered damage to their reputations and loss of property.

### 6.  Discovery of the Scheme

In October of 1999, the Securities Exchange Commission ("SEC") uncovered the scheme and arrested Gause and Homa.  Thereafter, the SEC began an investigation into Bellwether and Southwestern.  Despite having a clear conflict of interest, the Dill firm and Matsukage undertook the legal representation of the Marketer/Investor Plaintiffs, Bellwether,

and Southwestern in the SEC's civil investigation.  Matsukage and the Dill firm not only

represented the Marketer/Investor Plaintiffs, Bellwether and Southwestern with respect to

the SEC's civil investigation, but they also continued to represent to the Marketer/Investor

Plaintiffs that the Dill firm had fulfilled all of its obligations with respect to the Bellwether

and Southwestern offerings, that Bellwether and Southwestern had complied with all state

and federal securities laws, and that neither Matsukage, nor the Dill firm had done anything

improper or caused Marketer/Investor Plaintiffs or the Corporate Plaintiffs any damage.

Matsukage and the Dill firm continued their representation fo the Marketer/Investor Plaintiffs

and Corporate Plaintiffs before the SEC until April of 2001, when the Marketer/Investor

Plaintiffs and Corporate Plaintiffs learned for the first time that Matsukage and the Dill firm

had not performed the services they represented that they had performed, that the securities

were not properly registered, that the securities were not entitled to any exemption.  The

Marketer/Investor Plaintiffs and Corporate Plaintiffs became subject to SEC disgorgement

proceedings.

**D.  The Claims**

The Plaintiffs' Amended and Superceding Complaint (Doc. # 7) sets forth a number

of claims.  The First Claim for Relief alleges a violation of 18 U.S.C. § 1962(c).  This claim

is a RICO claim is brought by all Plaintiffs against all Defendants.  The Second Claim for

Relief alleges a violation of 18 U.S.C. § 1962(d).  This is also a RICO claim brought by all

Plaintiffs against all Defendants.  The Third Claim for Relief alleges violations of the

Securities Exchange Act of 1934.  This federal securities claim is brought by the Investor Plaintiffs against all Defendants.  The Fourth Claim for Relief is brought by the Alabama Investor Plaintiffs against all Defendants for alleged violation of the Alabama Securities Act.  The Fifth Claim for Relief is brought by the California Investor Plaintiffs against all Defendants for alleged violations of the California Securities Act.  The Sixth Claim for Relief is brought by the Colorado Investor Plaintiffs against all Defendants for alleged violations of the Colorado Securities Act.  The Seventh Claim for Relief is brought by the Florida Investor Plaintiffs against all Defendants for alleged violations of the Florida Securities Act.  The Eighth Claim for Relief is brought by the Iowa Investor Plaintiffs against all Defendants for alleged violations of the Iowa Securities Act.  The Ninth Claim for Relief is brought by the Kansas Investor Plaintiff against all Defendants for alleged violations of the Kansas Securities Act.  The Tenth Claim for Relief is brought by the Kentucky Investor Plaintiff against all Defendants for alleged violations of the Kentucky Securities Act.  The Eleventh Claim for Relief is brought by the Michigan Investor Plaintiffs against all Defendants for alleged violations of the Michigan Securities Act.  The Twelfth Claim for Relief is brought by the Nebraska Investor Plaintiff against all Defendants for alleged violations of the Nebraska Securities Act.  The Thirteenth Claim for Relief is brought by the Ohio Investor Plaintiff against all Defendants for alleged violations of the Ohio Securities Act.  The Fourteenth Claim for Relief is brought by the Washington Investor Plaintiffs against all Defendants for alleged violations of the Washington Securities Act.  The Fifteenth

Claim for Relief is brought by all Investor Plaintiffs against all Defendants for conspiracy to violate state and federal securities laws and to defraud the Investor Plaintiffs. The Sixteenth Claim for Relief is brought by all Investor Plaintiffs against all Defendants for common law fraud. The Seventeenth Claim for Relief is brought by all Investor Plaintiffs, by the Marketer/Investor Plaintiffs, and by both Corporate Plaintiffs against the Dill firm and Matsukage for breach of fiduciary duty. The Eighteenth Claim for Relief is brought by all Investor Plaintiffs against the Dill firm and Matsukage for wantonness or negligence. The Nineteenth Claim for Relief is brought by all Investor Plaintiffs, all Marketer/Investor Plaintiffs, Bellwether and Southwestern against the Dill firm and Matsukage for breach of contract.

**E.  The Pending Motion**

Currently pending before this Court is the Motion to Dismiss by Defendants Dill, Dill, Carr, Stonbraker & Hutchings, P.C. and Fay Matsukage and Brief in Support Thereof (Doc. # 10). This motion was filed on June 9, 2003. The briefs and exhibits submitted in support of and in opposition to this motion are voluminous and complex.

## MOTION TO DISMISS STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. Prior to the Supreme Court's recent decision in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007), a motion to dismiss could only be granted if a plaintiff could prove "no set of facts . . . which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also*

*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986). Now, in order to survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974. Plaintiff's "[f]actual allegations must be enough to raise a right to relief above a speculative level on the assumption that the allegations in the complaint are true." *Id*. at 1965. It is not sufficient that the pleadings merely "le[ave] open the possibility that the plaintiff might later establish some set of undisclosed facts to support recovery." *Id*. at 1968 (internal quotation and alteration omitted). Dismissal under Federal Rule of Civil Procedure 12(b)(6) on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred. *See, e.g., La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004); *Omar v. Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 2003).

## DISCUSSION

**A.    The Investor Plaintiffs' Federal Securities Claims Are Time-Barred.**

The Investor Plaintiffs (but not the Marketer/Investor Plaintiffs or the Corporate Plaintiffs) assert claims against Matsukage and the Dill firm pursuant to § 10(b) of the Federal Securities Exchange Act of 1934. *See* Doc. 7 at ¶¶ 279 to 284 (Third Claim for Relief for Violations of the Federal Securities Exchange Act of 1934) & ¶¶ 351 to 353 (Fifteenth Claim for Relief for Conspiracy to Defraud). Specifically, the Investor Plaintiffs allege that Matsukage and the Dill firm intentionally or recklessly made misrepresentations

21

of material facts in the Bellwether offering statements and the 270 day promissory notes and in connection with the sale of the Bellwether securities.  Additionally, the Investor Plaintiffs allege that Matsukage and the Dill firm intentionally or recklessly made misrepresentations of material facts in the Southwestern offering statements and seven year bonds.  Based on the allegations of the Plaintiffs' Amended and Superceding Complaint, it is clear that none of the Investor Plaintiffs purchased Bellwether or Southwestern securities, bonds, or notes after June of 1999.

### 1.  Applicable Statute of Limitations

At the time that the alleged fraud occurred in this case, Plaintiffs' claims were governed by the statutes of limitations and repose contained in 15 U.S.C. § 77i(e).  This section provided that any claim under § 10(b) must be brought within the earlier of three years of the alleged violation or within one year of the "discovery of the facts constituting the violation."  *See* 15 U.S.C. § 78i(e); *see also Lampf, Pleva, Lipkind, Prupis & Pettigrow v. Gilbertson*, 501 U.S. 350, 363 (1991).  The three years limitations period acts as a statute of repose, is not subject to *equitable* tolling,[23] and begins to run, at the latest, from the date of the sale of the security.  *See, e.g., Lampf, Pleva, Lipkind, Prupis & Pettigrow,* 501 U.S. at 364; *Bradway v. Am. Nat'l Red Cross*, 992 F.2d 298, 301 (11th Cir. 1993) ("the statute of

---

[23]  "Equitable tolling" refers to the tolling of the running of the statute of limitations where, for example, the claimant has filed a defective pleading during the statutory period, *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 434-36 (1965), or where the plaintiff has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.  *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231 (1959).

repose destroys the previously existing rights so that, on the expiration of the statutory period, the cause of action no longer exists."); *Fischler v. AmSouth Bancorporation*, 971 F. Supp. 533, 536 (M.D. Fla. 1997) (15 U.S.C. § 78i(e) contains a three year statute of repose to which equitable tolling does not apply and which commences at the latest on the date on which the security was sold).

The original complaint was filed on March 12, 2003. The allegations of the Plaintiffs' Amended and Superceding Complaint (Doc. # 7) make it plain that none of the Bellwether or Southwestern offerings continued after June of 1999. Therefore, absent legal tolling or a retroactive application of a more recently enacted statute of limitations, their § 10(b) claims became barred by the statute of repose no later than June of 2002. Plaintiffs argue that the statute of limitations and statute of repose applicable to their 10(b) claims were tolled from October 18, 1999 through February 21, 2003 due to the pendency of certain other legal actions. Plaintiffs also argue that the statute of limitations in the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658(b), revived their claims, and thus, their claims are timely. The Court will address each of these contentions in turn.

### 2. Legal Tolling

The Investor Plaintiffs contend that the statute of limitations and statute of repose applicable to their claims under § 10(b) should be tolled during the pendency of the SEC

Action[24] and the *Wolff* action.[25]  They also argue the time of the pendency of their claims

against Matsukage and the Dill firm in their two Shelby County actions should act to toll the

running of the statute of limitations and statute of repose applicable to their claims under §

10(b).[26]  Defendants dispute these contentions.

_____

[24]  On October 18, 1999, the SEC filed an action in the United States District Court for the Northern District of Illinois, styled as *SEC v. Homa, et al.,* Civil Action Number 99-CV-6895 ("the SEC action").  The complaint in the SEC action sought an injunction against Gause, Homa and others, including several of the Plaintiffs in this action (*e.g.* Bellwether, Southwestern, several of the Marketer/Investor Plaintiffs) and sought to recover investments from C4T and others involved in the C4T scheme.  Eventually a Receiver was appointed to pursue the Investor Plaintiffs' claims.  All Investor Plaintiffs are members of the Receiver's class of plaintiffs.  Matsukage and the Dill firm received a copy of the complaint in the SEC action from Nichols, a Marketer/Investor Plaintiff in this action and a defendant in the SEC action.  Neither Matsukage, nor the Dill firm were named as defendants in the SEC action.  Several of the plaintiffs to this action, were named as defendants to the SEC action.

[25]  On February 8, 2000, a class action complaint was filed in the United States District Court for the Southern District of Florida, Miami Division, styled as *Robert S. Wolff, et al., v. Cash 4 Titles, et al.,* Civil Action Number 00-052 ("the Wolff action").  This complaint asserted a class action on behalf of a nationwide class of plaintiffs who made investments in C4T and was a class against a variety of named defendants.  Neither Matsukage, nor the Dill firm were named defendants in the *Wolff* action.  The *Wolff* Complaint purported to include claims against various "Jane and John Does."  The Court notes that the Federal Rules of Civil Procedure do not authorize the use of fictitious defendants in pleading practice.  *See, e.g.,* Fed. R. Civ. P. 10(a); *New v. Sports & Recreation, Inc.,* 114 F.3d 1092, 1094 n.1 (11th Cir. 1997); *Harris v. Palm Harbor Homes, Inc.,* 198 F. Supp. 2d 1303, 1304 n.6 (M.D. Ala. 2002); *Edwards v. Alabama Dep't of Corr.,* 81 F. Supp. 2d 1242, 1257 (M.D. Ala. 2000).  The Court also finds it noteworthy to mention that the *Wolff* action was a plaintiffs' class action and did not attempt to identify a class of defendants.  The *Wolff* action only asserted RICO claims.  It did not include claims under § 10(b).

[26]  On April 27, 2001, the Investor Plaintiffs filed independent claims by filing *Champion v. Dill Dill, et al.,* Civil Action Number CV-01-430 in the Circuit Court for Shelby County, Alabama.  On September 12, 2001, they commenced *Austin v. Dill Dill, et al.,* Civil Action Number 01-971 in the Circuit Court for Shelby County, Alabama.  The claims in

The United States Supreme Court has held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted member of the class who would have been parties had the suit been permitted to continue. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552-54 (1974). *See also, Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) (expanding the *American Pipe* tolling rule to include all putative members of the plaintiff class, including those who bring separate suits).  Although the Supreme Court later also held that equitable tolling does not apply to statutes of repose, *Lampf*, 501 U.S. at 363-63, a majority of lower courts addressing the issue have declined to extend that holding to cases in which a plaintiff argues the pendency of a prior class action should toll the running of a statute of limitations or a statute of repose.  *See, e.g., Joseph v. Wiles*, 223 F.3d 1155, 1166-68 (10th Cir. 2000); *In re Enron Corp. Sec.*, 465 F. Supp. 2d 687, 717 (S.D. Tex. 2006) (collecting cases);  *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 600 n.11 (N.D. Ill. 1998).  This doctrine is sometimes referred to as "legal tolling" or *American Pipe* tolling, and it is predicated on a different legal justification than "equitable tolling."  Pursuant to this doctrine, the filing of a class action tolls a statute of limitations as to the members of the class from the time class certification is requested until such time as certification is denied, if that occurs.  *Crown, Cork & Seal Co.*, 462 U.S. at 350; *American*

---

these two state court actions were essentially the same as the claims in this case except that they omitted the RICO and § 10(b) claims and were only brought pursuant to state law.  On February 21, 2003, the Alabama Supreme Court granted Petitions for Writ of Mandamus filed by Matsukage and the Dill firm and ordered the dismissal of those defendants for lack of personal jurisdiction.

*Pipe*, 414 U.S. at 554.  Thereafter, class members must file individual suits to protect their interests.  *American Pipe*, 414 U.S. at 554.  Because a class action complaint "commences the action for all members of the class as subsequently determined," to hold that a period of limitations was not tolled in the interim would "frustrate the principal function of a class suit," as potential class members would be required to file individual actions or intervene to protect their rights.  *See American Pipe*, 414 U.S. at 550-551.  The legal tolling rule is consistent both with Federal Rule of Civil Procedure 23, which is designed to promote efficiency and with the purposes of statutes of limitations, which are to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights.  *Id.* at 554-56.

The *American Pipe* doctrine is not without limits.  First, only those defendants who were parties in the original class action can be deemed to have had the requisite notice of the claims asserted against them to be subject to the rule.  *American Pipe*, 414 U.S. at 554-55.  Because neither Matsukage, nor the Dill firm were named as defendants in either the SEC action or the *Wolff* action, they cannot be deemed to have received the essential information necessary to determine both the subject matter and size of the prospective litigation, that is required to justify the tolling rule.  *Id.* at 555.  Thus, the legal tolling doctrine will not operate to toll the running of either the statute of limitations or the statute of repose for the periods of time during which the SEC action or the *Wolff* action were pending.

Another significant limitation on the *American Pipe* "legal tolling" doctrine is its inapplicability in the cross-jurisdictional context.  The pendency of prior state court class

26

actions arising out of the same factual situation does not toll the statute of limitations or statute of repose for claims under federal law subsequently filed in federal court. *See, e.g., In re Copper Antitrust Litig.*, 436 F.3d 782, 793-97 (7th Cir. 2006) (holding that *American Pipe* tolling did not apply to save plaintiffs' federal antitrust claims where plaintiff sought tolling for the time during which their earlier filed class action under state antitrust law only); *Meadows v. Pacific Inland Sec. Corp.*, 36 F. Supp. 2d 1240, 1252-53 (S.D. Cal. 1999) (statute of limitations in securities fraud action was not tolled as of the date suit involving the same transaction was commenced as a class action in a state court under state law).  For this reason, the Shelby County actions, which were brought solely pursuant to state law did not toll the running of either the statute of limitations or the statute of repose on Plaintiffs federal securities claims.  Accordingly, "legal tolling" under *American Pipe* and its progeny do not make the Investor Plaintiffs' § 10(b) claims timely.

### 3.  Sarbanes-Oxley Act of 2002

The Investor Plaintiffs argue that the statute of limitations in the Sarbanes-Oxley Act of 2002 ("SOA"), 28 U.S.C. § 1658(b), revived their claims, and thus, their claims are timely. That section provides:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of–
> > (1) 2 years after the discovery of the facts constituting the violation; or
> > (2) 5 years after such violation.

28 U.S.C. § 1658(b).  President Bush signed this provision into law on July 30, 2002.

The Investor Plaintiffs argue that because the original complaint was filed within five years of the date of their purchases, their claims are timely under the new statute of limitations, which took effect on July 30, 2002.  Matsukage and the Dill firm argue that because the Investor Plaintiffs claims expired at the latest in June of 2002, prior to the effective date of the SOA, the new statute of limitations can not revive their claims because the SOA does not apply retroactively.

Plaintiffs argument is problematic because the law of this circuit is quite clear that the running of the statute of repose extinguishes previously existing claims.  *See, e.g., Bradway*, 992 F.2d at 301 ("the statute of repose destroys the previously existing rights so that, on the expiration of the statutory period, the cause of action no longer exists."); *Fischler*, 971 F. Supp. at 536(15 U.S.C. § 78i(e) contains a three year statute of repose to which equitable tolling does not apply and which commences at the latest on the date on which the security was sold).  This is rule is not compatible with Plaintiffs' theory of SOA acting to revive their claims when it was later enacted.

This is not the first time a plaintiff has argued that the SOA's statute of limitations is retroactive.  Indeed, almost every circuit in the United States has ruled on the issue.  This Court has not found a single case, not overruled, that has held that the statute of limitations in the SOA applied retroactively to revive claims extinguished by law prior to the effective date of the SOA.  *See In re Enter. Mortgage Acceptance Co. Sec. Litig.*, 391 F.3d 401, 406 (2d Cir. 2005) [hereinafter *Enter. Mortgage*]; *Lieberman v. Cambridge Partners, LLC*, 432

28

F.3d 482, 492 (3d Cir. 2005); *Glaser v. Enzo Biochem, Inc.*, 126 Fed. Appx. 593, 598 (4th

Cir. 2005); *Margolies v. Deason*, 464 F.3d 547, 551 (5th Cir. 2006); *Foss v. Bear, Stearns*

*& Co.*, 394 F.3d 540, 542 (7th Cir. 2005); *In re ADC Telecomm., Inc. Sec. Litig.*, 409 F.3d

974, 978 (8th Cir. 2005); *Berman v. Blount Parrish & Co.,* Inc., 523 F. Supp. 2d 1298, 1301-

02 (M.D. Ala. 2007); *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 337 (D. Mass. 2005); *In re*

*Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 879 (E.D. Tenn. 2005).  The Eleventh

Circuit Court of Appeals has not addressed the question as yet.[27]

---

[27]   *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005) (*Tello I*) was an interlocutory appeal from a district court's ruling that the SOA *did* revive stale claims.  *See Tello I*, 410 F.3d at 1277-78.  *Tello I* reversed the district court's decision and remanded the case back for additional fact-finding to determine when the plaintiff had inquiry notice of his claims against Dean Witter.  *See id.* at 1294.  The Circuit made it clear that they were not ruling on the retroactivity of the SOA:

> We recognize that other circuits have decided that § 1658(b) cannot be applied retroactively to revive securities fraud cases, when the claims were time-barred under the former statute of limitations.  On the undeveloped record in this case, however, *it is premature for us to make that legal determination.*

*See id.* at 1294 n.19 (emphasis added and internal citations omitted).  After the district court conducted additional fact-finding, the case went back to the Circuit in *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 974 n.17 (11th Cir. 2007) (*Tello II*).  In that opinion, the Circuit held that the plaintiff had inquiry notice in September 1998, which meant that his claims were time-barred under both the old 1-year/3-year statute of limitations, and the SOA's 2-year/5-year statute of limitations.  *See Tello II*, 494 F.3d at 975.  The Circuit noted that "[b]ecause Tello and the class are time-barred under both the former statute of limitations and the SOA statute of limitations, *the question of whether the SOA statute of limitations revives securities-fraud actions that were time-barred under the former statute of limitations is not presented in this case.*"  *Id.* (emphasis added).  Therefore, based on this Court's reading of these decisions, the issue of the retroactivity of the SOA's statute of limitations provision has not been decided in this circuit.

As noted above, six other circuits have squarely addressed the issue and held that the SOA's statute of limitations does not revive stale claims. The Second Circuit was the first circuit to address the issue. *See Enter. Mortgage*, 391 F.3d 401. Every circuit court that has addressed the issue has followed that decision. This Court finds that the analysis in *Enterprise Mortgage* is a thorough and correct statement of the law. Consequently, this Court adopts the reasoning of the Second Circuit in *Enterprise Mortgage* that the SOA does not revive stale claims. *See id.* at 405-10. Accordingly, Investor Plaintiffs § 10(b) claims expired no later than three years after the offerings were last made available to the public, and their § 10(b) claims expired no later than three years after the security was purchased. Therefore, all of Investor Plaintiffs' federal securities claims were barred by the applicable statute of repose before the statute of limitations in § 1658(b) became effective on July 30, 2002. Because this Court finds that § 1658(b) is not retroactive, the Investor Plaintiffs' claims pursuant to the Federal Securities Exchange Act of 1934 must be dismissed.

**B.    Plaintiffs RICO Claims Are Legally Barred.**

RICO, 18 U.S.C. § 1961, *et seq.*, provides civil and criminal liability for individuals engaged in "a pattern of racketeering activity." 18 U.S.C. § 1962(a-d). Private individuals suffering injury resulting from RICO violations have a cause of action under the act. *See* 18 U.S.C. § 1964. The elements of a civil RICO cause of action are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (*quoting Sedima S.P.R.L. v. Imrex Co., Inc.*,

30

473 U.S. 479, 496 (1985)).   A pattern of racketeering activity consists of two or more "predicate acts" of racketeering activity occurring within a ten year period.  18 U.S.C. § 1961(5).  "Racketeering activity" includes acts that are indictable under designated criminal offenses, including federal statutes prohibiting mail and wire fraud.  18 U.S.C. § 1961(1).

Matsukage and the Dill firm contend that Plaintiffs' RICO claims are barred by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 18 U.S.C. § 1964(c).  The PSLRA provides that a civil RICO claimant may not "rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962" unless the person who committed said fraudulent conduct has been criminally convicted.  *See* 18 U.S.C. § 1964(c).  Matsukage and the Dill firm move to dismiss the RICO claims with prejudice because the conduct on which Plaintiffs rely as predicate acts of racketeering, alleged wire and mail fraud, would be actionable as securities fraud claims.

The purpose of the PSLRA was to amend RICO by narrowing the kind of conduct that could qualify as a predicate act and to eliminate securities fraud as a predicate offense in a civil RICO action and to prevent a plaintiff from pleading other specified offenses, such as mail or wire fraud as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.  *See, e.g., Bald Eagle Area Sch. Dist. v. Keystone Finan., Inc.*, 189 F.3d 321, 327 (3rd Cir. 1999); *Cook v. Campbell*, 482 F. Supp. 2d 1341, 1349-50 (M.D. Ala. 2007).

In an effort to meet the minimum pleading requirements for their RICO claims,

Plaintiffs allege that the Dill firm and Matsukage engaged in predicate acts of mail fraud, wire fraud, and money laundering.  *See* Am. Compl. at ¶¶ 256-257.  Plaintiffs further allege that this racketeering activity was conducted from sometime in early to mid-1997 and continued until April 2001 and after.  *Id.* at ¶ 259.  All predicate acts are alleged to have had the purpose of diverting and misappropriating monies loaned for Cash 4 Titles' business and for the purpose of concealing the theft from Cash 4 Title.  *Id.*  As part of their RICO allegations, Plaintiffs explicitly allege that all defendants to this action conducted and participated in a Ponzi scheme through a pattern of racketeering activity.  *Id.* at ¶¶ 256-267. Indeed, Plaintiffs' mail fraud allegations against the Dill firm and Matsukage include allegations that they committed mail fraud by distributing allegedly fraudulent Bellwether and Southwestern offering documents to investors; distributing allegedly fraudulent Southwestern offering documents to state securities commissioners to facilitate their sales; and using the interstate mail system to review and approve all the subscription agreements by any Investor Plaintiff in Southwestern.  *See* Am. Compl. at ¶¶ 231, 245, 246, 247, & 265. Plaintiffs' wire fraud and money laundering allegations suggest that the Dill firm and Matsukage conspired or engaged in a pattern of racketeering activity for the unlawful purpose of intentionally embezzling, diverting and otherwise misappropriating funds loaned to the C4T entities.  *See* Am. Compl. at ¶¶ 259-60, 262, & 264-65.

Because Plaintiffs' mail fraud, wire fraud, and money laundering allegations are intrinsically connected to their securities fraud claims, they cannot serve as predicate acts for

purposes of establishing their RICO claims.  Plaintiffs' allegations clearly show that Plaintiffs contend that the Dill firm and Matsukage engaged in the mail fraud, wire fraud, and money laundering set forth above to further the Ponzi scheme.  Under *Bald Eagle* and its progeny, the PSLRA precludes Plaintiffs from relying on allegations such as these.  *See, e.g., Bald Eagle*, 189 F.3d 321; *Sell v. Zions First Nation Bank*, No. CV05 0684 PHX SRB, 2006 WL 322469 at *9-*11(D. Ariz. Feb. 9, 2006); *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F. Supp. 2d 559 (E.D.N.Y. 2002); *Burton v. Ken-Crest Servs., Inc.*, 127 F. Supp. 2d 673 (E.D. Pa. 2001); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481 (E.D. Pa. 2000); *Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364 (D.N.J. 1999). In sum, all of the predicate acts relating to mail fraud, wire fraud, and money laundering that Plaintiffs have alleged in support of their RICO claims were committed "in connection" with securities fraud and barred by the PSLRA.  Having failed to plead the requisite predicate acts,[28] all of Plaintiffs' RICO claims against Matsukage and the Dill firm are due to be DISMISSED.

**C.     The Court Declines To Exercise Supplemental Jurisdiction Over the Remaining State Law Claims.**

As previously indicated, this Court has subject matter jurisdiction over Plaintiffs state law claims against Matsukage and the Dill firm pursuant to 28 U.S.C. § 1367(a) only.  That section provides that district courts "may decline to exercise" supplemental jurisdiction over

---

[28] Plaintiffs sole remaining predicate act plead, obstructing justice, is insufficient to alone support the RICO claims.

a claim under § 1367(a) if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  When a court declines to exercise supplemental jurisdiction, 28 U.S.C. § 1367(d) provides a plaintiff with an opportunity to file the dismissed claims elsewhere by tolling the running of the statute of limitations during the time the claims were pending before the federal court pursuant to § 1367(a).

By this Memorandum Opinion and Order, the Court has found that all of the federal claims against Matsukage and the Dill firm are due to be dismissed.  Thus, all of the claims against these two defendants over which the Court had original jurisdiction will, upon entry of this Memorandum Opinion and Order, no longer be a part of this action.  Several factors, including judicial economy, convenience, and fairness to the litigants, weigh in favor of dismissing without prejudice the Plaintiffs' remaining state law claims.  *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997).  This is especially true because this case has not progressed beyond the initial pleading stage.  *Id.* at 1353 ("dismissal of state law claims strongly encouraged when federal law claims are dismissed prior to trial").  *Accord Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[w]hen federal law claims have dropped out of the lawsuit in its early stages and only state law claims remain,

the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice"); *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) ("[i]f the federal claim is dismissed prior to trial, [*United Mine Workers v.*] *Gibbs* [, 383 U.S. 715 (1966)] strongly encourages or even requires dismissal of the state law claims").  For these reasons, the Court deems it appropriate pursuant to 28 U.S.C. § 1367(c)(3) to dismiss all remaining claims against Matsukage and the Dill firm without prejudice.

Moreover, the remaining claims against Matsukage and the Dill firm present complex issue of state law arising under a variety of different state statutes.  These are precisely the kinds of claims for which 28 U.S.C. § 1367(c)(1) provides the authority for district courts to decline to exercise supplemental jurisdiction.  For this additional reason, the Court declines to exercise supplement jurisdiction over the remaining claims against Matsukage and the Dill firm.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1.  The Motion to Dismiss by Defendants Dill, Dill, Carr, Stonbraker & Hutchings, P.C. and Fay Matsukage (Doc. # 10) filed on June 9, 2003 is GRANTED in part and DENIED in part as set forth in this Memorandum Opinion and Order.

2.  All claims by the Investor Plaintiffs against Defendants Dill, Dill, Carr, Stonbraker & Hutchings, P.C. and Fay Matsukage pursuant to the Securities Exchange Act of 1934

(Third Claim for Relief and part of the Fifteenth Claim for Relief) are DISMISSED WITH PREJUDICE because they are barred by the statute of repose.

    3.  All claims of all Plaintiffs against Defendants Dill, Dill, Carr, Stonbraker & Hutchings, P.C. and Fay Matsukage pursuant to 18 U.S.C. § 1962 (First and Second Claim for Relief) are DISMISSED WITH PREJUDICE because they are legally barred.

    4. All other claims against Defendants Dill, Dill, Carr, Stonbraker & Hutchings, P.C. and Fay Matsukage are DISMISSED WITHOUT PREJUDICE for lack of jurisdiction and Defendants Dill, Dill, Carr, Stonbraker & Hutchings, P.C. and Fay Matsukage are DISMISSED as a defendants to this action.

    DONE this the 31st day of March, 2008.


                                     /s/ Mark E. Fuller
                              CHIEF UNITED STATES DISTRICT JUDGE